v. Ackerman, I applaud the Thank you, Mr. President. I would like to please the court, prosecutor. We represent Mr. Miller. I represent Mr. Miller, along with Joseph Guinera, who sits at council table. We'd ask the court to reverse his conviction for criminal sexual abuse, criminal sexual assault, because of the paucity of reasonable evidence supporting the jury conviction. It is our position, and we have authority to support it, that the reasonable inferences to be drawn from the record must be given to the defendant if they favor the defendant. Here we have, and it's tragic but true, a five or six year old youngster suffering from constipation and ongoing UTI problems, probably from six months to the time she testified, I don't know. And eventually she claimed to her mother that her dad was weird, that her dad tied her up with gray tape and assaulted her, that her aunts called the police because of his misconduct, that the police let him go. Counsel, pardon me for interrupting. I had a question I wanted to ask you, please. In arguing ineffective assistance of counsel for not challenging GM's competency based on her inconsistent testimony, what's been described as perhaps outlandish or frivolous, the frivolous nature of her testimony, aren't you confusing competency with credibility? And, I mean, the requirements for a witness being declared incompetent are very different. She had to be incapable of expressing herself. She wouldn't know the difference between a truth and a lie. So aren't you confusing those two concepts? I concur with Your Honor that it's a low threshold for competency of a witness, particularly a child. There's no question about that. In this particular case, at the end of the 15-10, 115-10 hearing, the trial court said, of course, I'll voir dire the witness regarding competency to testify before she testifies. After the jury was struck in this case, the judge mentioned something about competency of the witness, meaning GM. The prosecutor said simply, there's no motion to challenge or conduct any proceeding regarding the competency of the GM. Regarding your claim of ineffective assistance for failure to seek a competency hearing, you cite three cases, but you provide no argument regarding how those standards would apply to the facts of this case. Doesn't that result in forfeiture? I mean, you're making that argument now here for the first time. It's not in your briefs. Doesn't that result in forfeiture of this argument? No. I do mention exactly that in my opening brief. I mention exactly what the judge said at the close of the 115-10 hearing. And at the beginning of the trial, after the jury was selected, the prosecutor told the court, there is no competency motion pending by the defendant, period. That was the end of it. I am not suggesting that that standing alone represents ineffective assistance of counsel. It's a cumulative argument here. And the cumulative part of it includes, as example, not proffering a single witness, expert witness, where the State proffered to. Was this all raised in the post-trial motion? I couldn't. Was this all raised in the post-trial motion? No, Your Honor. Why is it not forfeited? Because post-trial counsel was equally ineffective for not presenting any of this. Post-trial counsel is now a judge. Trial counsel is now a judge. Trial counsel is a Winnebago-Corning Circuit Court Associate Judge. Post-trial counsel is a Circuit Court Judge in Cook County. It's an odd circumstance that I don't know any member of the Court has encountered this before. I have not. I don't take any pleasure in asserting that either post-trial counsel or trial counsel, their performances were deficient and prejudicial. But in this case, you take the record as you find it. And I'm not saying it's fully developed. And if the Court finds that the Illinois, 2017 Illinois Supreme Court decision in People v. Beach, if the Court finds that it's not developed to the point where the Court cares to rule definitively on it, the Court can either retain jurisdiction and remand for those proceedings, which would be in the nature of a crankle proceeding. Or direct that the Court will not consider it now, and it can be presented for post-conviction review. The difficulty with the post-conviction part of it is the burdens are inverted. And that is, were this Court to retain jurisdiction and there to be proceedings below, the prosecution had the burden of showing that any deficiencies, i.e. prejudice, the State has the burden of showing it's harmless beyond a reasonable doubt. In a post-conviction, the defender must show that it was not only harmful, but prejudicial. So you invert the standards of review and the burdens. Well, with respect to the claim of ineffective assistance, with respect to a claim of ineffective assistance, you'd have to show it on direct review if it were fully developed, and it hasn't been. So it's just not fully developed. And if it were, you would still have to show deficiency and prejudice. That's not the State's burden. With respect, Your Honor, if we show prejudice, the State must show it's harmless beyond a reasonable doubt if it's a constitutional issue. Again, you carry the ball first, though. Sure. Okay. Let me ask you this. You say that we have to draw inferences in favor of the defendant. That's not the standard of review. The standard of review is clear, and I'm not suggesting it is. I'm suggesting where the facts are such that there are inferences that can be drawn either way. If they favor a particular – if those inferences reasonably take – favor the defendant, that then changes the calculi. Your Honor cited that in Guerrero 3. Your Honor made it a point of showing it. In Guerrero, the issue was whether or not there was any evidence in the record that would support an inference that there was penetration. So I wrote Guerrero. I know you did. Okay. As a matter of fact – The cases you cite regarding our review existed decades before Illinois reviewing courts abandoned the clear and convincing standard for evaluating the testimony of victims of sex offenses. In People v. Pintos, the Illinois Supreme Court made clear that the reasonable doubt test that's set forth in Collins should be applied in reviewing the sufficiency of evidence in all criminal cases, all criminal cases. So we look at the testimony in this case just like any other case, not the close scrutiny that used to be applied to sex crime victims. These cases are – I'm talking about child sex abuse, sex assault cases, jury convictions – carry with it a special responsibility of counsel. And that special responsibility is because these cases are by themselves offensive to everyone in the court system, including jurors, and particularly jurors. And there's an opinion 110 years ago from the Illinois Supreme Court – I didn't cite it in my brief, but I shared it with my sits of counsel – People v. Freeman, where the court specifically discussed the offensive nature of cases of this kind. In part, the Freeman court from 1910 – and the cite is 244 Ill 590, 110 years ago – public indignation is even more apt to be aroused in prosecutions for crimes of this kind against children than when the charge is brought by an adult. It is especially necessary that the court should carefully examine the evidence in such cases in order to see that the verdict is not the result of passion or prejudice on the part of the jury. That's from the unanimous Supreme Court 110 years ago. We are not talking about anything I've made up. We're talking about something that the Illinois Supreme Court recognized a century and 10 years ago. In your reply brief, you raised for the first time a new argument of ineffective assistance of counsel based on the stipulation that was entered between defense counsel and the prosecution. Yes. But how can we consider this argument or this contention given the Supreme Court Rules 341H7, which says that you cannot raise a new argument in a reply brief? I concur with Your Honor. I was trying to show – I was trying to demonstrate, Justice Sotomayor, what to do in a difficult breach situation. Because if People v. Breach stand for the proposition that at times you present the issue or waive the issue, then you're leaving defense counsel somewhere in the middle. What to do now? Because on a post-conviction, the state turns around and urges that there was a waiver by not presenting it on direct appeal, and you should have done that. So you're putting the defense bar – and I say this respectfully, not you – but the courts have, and the Illinois Supreme Court has done exactly that by saying, well, if it's there, you have to raise it, and if it's not there, you shouldn't raise it. But if it's in the middle, it's risky. And it's risky because there may be a waiver if you don't raise it. Hence, I present it. It's the important part of this is I am hoping, if the Court at least sees that part of it for the defendant, that you retain jurisdiction and permit us to return to the circuit court to fulfill our record obligation. Kennedy, you cite Schott in your brief. But isn't Schott quite different than the facts of this case? In Schott, the victim had a motive to testify falsely against her stepfather, and she had also falsely accused her uncle in the past. Correct? There's no such motive here for GM to testify falsely against her father, is there? Oh, certainly there is. What is that? Just before this happened, a day or two before this happened, her real father — it's not a stepfather — her real father and her mother had a dispute, and the dispute had to do with her going to preschool, and there had already been judicial proceedings about custody. And so at this point, that is exactly when, within 48 hours of that dispute, is when all of a sudden GM, for the first time, presents Mom with this scenario. And then Mom takes her to the doctor, and the doctor calls DCS. And Mom is told, unless you get a restraining order, we're taking GM from you. And that's what the record reflects. And then the record reflects that GM, when she went and spoke with the first expert, I'll call her expert, Ms. Tishman, she told Ms. Tishman any number of things from the dog pooping on her while Dad was assaulting her in the shower, to Aunt Debbie calling the police and the police letting them go, and Dad called the police on her — Go ahead. — called the police on her, and they let him go. All of this, none of it, none of it was explored by Ms. Tishman or the second expert, Ms. Kruger. So if they had a predisposition in favor of the assault charges, if you will, it's patently clear from this record. Let me just ask you real quickly. Do you believe — would you agree that there's some evidence in the record of each and every element of the offenses? Yes, of course. Except there is the one area, and I beg to backtrack a moment. The count suggesting that there was his penis involving her anal area, I think she so totally denied that during trial. During trial. As a matter of fact, she denied all of it during trial. Right, but there were 11510 statements that were admitted that are substantive evidence, correct? And defense counsel didn't even subpoena GM for that 115-10 hearing, and the only thing in the record is that, well, she would have had to miss part of school. Well, anyway, thank you. You'll have time for a rebuttal. Thank you. Ms. Lee. Good morning, Your Honors. May it please the Court, Stephanie Lee for the State Counsel. As to the standard of review, I fully agree with Your Honor that it's the same standard as every single case out there, which is that we needed to prove it beyond a reasonable doubt. Now that we are on appeal, all of the inferences are supposed to be looked at in the light most favorable to the State on review, and that is what the job of this Court would be. So it would be to look at this case just as any other case. When you look at the case, there is more than sufficient evidence to support every element. In fact, the defendant doesn't challenge any specific element. He attempts to essentially discredit this victim, who the jury clearly believed. She testified from the record. You can tell she testified very clearly to her recollections. In the video, you can watch her at a 5-year-old speaking as you would expect a 5-year-old to express themselves, including doing a demonstration with crayons over what her father's penis looked like when he made her touch it. We have the 115-10 statements. We actually also have some medical evidence, which we don't always have in these cases, of the eight different UTIs and vaginal vulvatitis. And what the expert had said was that blood in the urine of a child that's prepubescent is never normal. And this child had it three times. The only evidence to come from the victim herself was on count one, correct? Count one from – well, within the 115-10 statements, which obviously – I'm just talking about from her testimony. On her testimony on the stand, she talked about count one with his finger. The rest of the stuff, she never denied it. She denied remembering telling that. Everything in the record, if you look at her testimony, is she didn't remember if she saw his private. She also said, I don't remember telling my mom that. I don't remember telling Marisol Tishman that. So she never actually denied that it happened or not. She was never really directly asked other than – they did say, did your daddy ever touch you anywhere else on your body that he shouldn't have. Well, wait, wait. When she spoke to the prosecutor, didn't she say that she never saw or touched the defendant's penis? Well, we have – we don't have that in her testimony on the stand at age seven. What we have is the stipulation of the parties that she, in fact, told the prosecutor she didn't recall ever seeing his penis or she didn't see his penis, and I believe that he was putting lotion on, I think, was the rest of the stipulation. That, again, didn't come directly out of the witness's mouth on the stand. You have her at age seven recollecting as best as a seven-year-old can and explaining as best as a seven-year-old can what had happened. The consistency that you have in this case is that she consistently said it was her father. She consistently said he touched her in different variations of that, and that never varied. And when she said she didn't remember saying it, she never denied it happened. And so I think the evidence here, especially when you add in the extra evidence of the medical evidence, that it is, in fact, very strong. And with respect to her mother, the only testimony or evidence that came about this alleged fight was through the defendant himself. It's obviously at that point self-serving that he would say, oh, we had a fight the night before. If you look at the mother's behavior, she was stunned, she was shocked. She didn't, oh, he was probably helping wipe you. The child's responses made her more concerned. What she did is take her child to the child's own doctor. She didn't call the police. She didn't call DCFS. This is not a woman who was out to get the defendant. She was clearly trying to see what she could do to help her daughter in what was a very shocking disclosure to her. And the disclosure that was first made was out of the blue. It was spontaneous. It fits in with what this child's experience would have been. And so it's not an unusual disclosure if you think of the nature of this child and what she had been through with these infections, saying, do I look red? The mom assumed that it was some of the same problems until she started hearing the rest of the story from her child. And she did exactly what a mother should do, which is take her to her doctor. And then she followed DCFS's advice absolutely. And she kept her daughter from him after this was disclosed. We have absolutely no evidence other than the father's self-serving statement that they were fighting before. They had one mediation in, I think, 2012. They had reached an accord, essentially. That's what it sounds like from the record. There's certainly no evidence in the record of some kind of an ongoing problem between the two of them. In fact, he was watching her, this child, every single day during the weekday up until this happened. So that would rely on the idea that the mother was somehow fighting to keep him away from her. You agree that the record isn't fully developed on the issue of ineffective assistance as it relates to a retained expert, correct? Oh, as it relates to a retained expert, absolutely. The counsel in his argument has raised the issue of that we should retain jurisdiction and send it back for what in essence would be a crankle hearing. I mean, what's your position? I fully disagree with that. In any given case, then, all that would have to happen on appeal is sudden raising of issues that are not fully developed with the promise that, well, if you send it back and delay this proceeding, maybe we'll be able to develop it down below. That's exactly what the post-conviction petitions are designed to do. If there's truly an issue out there that has not been developed, that needs to be, that's the place to do it. You can file affidavits. Assuming you can get to the different stages, your first stage would be to show there is some expert here that could possibly have been relevant or applicable or admissible in this case, and we don't even know that. So we're supposed to delay this proceeding, send it back, have more court proceedings over something that we don't even know that it could be developed. To the extent there's some hints of what the expert might say, most of those things would be not admissible. This wasn't a case where our expert testified about some kind of a syndrome, like a rape trauma syndrome or something like that. And it also was, you can't just put an expert up to say, well, children aren't credible. You can't do that. So from everything we do see in the record, the little that we do see, or in the brief, really, there's nothing comparing it to the record that would have allowed those things to be admissible. If it can be developed, that's what a post-conviction petition would be for. The competency issue is a little more developed from the standpoint that it had at least been briefly discussed, and you see not only a 5-year-old video of this child expressing herself, promising to tell the truth, all of those things. You also have her on the stand doing the same. So any challenge to the competency was not going to go anywhere. There was a sidebar at the time that that was brought up, too, so we don't know what happened at the sidebar. The defense at that time was given an opportunity to object. There may be many strategy reasons why they decided not to. One of them could have been, you know, don't give her more chance to get comfortable with this setting. This was the first time this child has now seen her father in court and has to express herself and testify in this setting. If you were to do a voir dire and continue to ask her more questions, you're actually going to give her more chance to get used to that as opposed to... But also, regardless, we can see from the evidence that is before the court that there is no way that competency challenge was going to go anywhere. There are certain statements, you would agree, from the victim that were put into evidence that are either improbable or were shown to be false. For? Such as the police being called, the defendant being arrested and being let go and the cast and the dog and all of those things. Right. In that sense, we do have a five and then a seven-year-old. Really, most of that came up when she was five in the 11510 statements. We don't know where she may be conflating. She may be doing different, because this happened also multiple times. So we don't know. As far as the dog, we don't know. It's very possible a dog came into the bathroom, pooped when this was going on. I don't know that he pooped all over her. It's possible. I don't know. She said she didn't remember telling that. She never denied it happened. It doesn't fit with my experience that there would have been a 911 call or the aunt seeing something. But these could have been pieces of the multiple times that this has happened. So those bizarre claims are all tangential to the actual undermined claims? Absolutely. They don't undermine any of the evidence. And, again, we don't have a challenging of any specific element. All we have is she shouldn't be believed, and that's for the jury to decide. And the jury did hear all the evidence, including what we were just talking about, the elements that are supposedly a little outlandish or corrupt. Correct, absolutely. Thank you. Nobody has any further questions? No, thank you. We would ask the Court to affirm. Mr. Ackerman, rebuttal. Thank you. I simply beg to differ with my opponent's remarks to the Court. There's palpably false testimony in this record, and it came from the lips of the 5-year-old and what she told to Ms. Tishman, which is on a CD-ROM. So it's there. It was played for the jury. It came to the Court. It came to the trial court. Not only that, the State stipulated whether the prosecutor should have been disqualified. It's a separate question. Well, she had prosecutors interview witnesses all the time. She had a prover there. The prosecutor and Linda, and we don't know who Linda is except now you're going to know, she was from the CLCC Center, and she was one of the representatives who took GM to see the prosecutor, according to what we understand, 15 or 17 times, according to GM, and I'm sure that's an exaggeration or maybe not. I don't know. But what she did say is that to the prosecutor and Linda, her dad only touched her private two times in the bathroom of his house to put medicine on her, period. She never saw his privates. She never touched his privates. He never helped her in the shower. That has to stand for something. Well, let me ask you this. I'm sure you're familiar with this notion that's been repeated by our Court, by the Supreme Court, that children GM's age sometimes are subject to memory loss. In fact, suppressed memory is common with child sexual abuse, and trauma is also common. And it's also the purpose of 11510 statements to preserve what occurred when information is still fresh in a child's mind, correct? Of course. You agree with both of those, right? Of course. And by the way, I appreciate your leading questions. I just want to know if you agree those are propositions that the Supreme Court has recognized. And the Supreme Court has said, I'm sorry, the very case Veatch, the one that went to the Illinois Supreme Court in 2017, the essence of it was a stipulation, and whether the stipulation should have been entered into. Well, as it turns out, Mr. Veatch was granted a new trial because the defense counsel stipulated rather than put on live witness. Here, my view of it is the defense could have put on the prosecutor to tell the jury rather than use a stipulation. Thank you. Thank you. The court thanks both parties for their arguments today. The case will be taken under advisement. A written decision will be issued in due course. The court stands in recess. Thank you.